IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CECIL L. BEASLEY,                     )
                                      )
            Plaintiff,                )
                                      )
vs.                                   )            Case No. 2:07-cv-1955-TMP
                                      )
NEXTRAN CORPORATION, d/b/a Nextran    )
Truck Center Birmingham,              )
                                      )
            Defendant.                )

MEMORANDUM OPINION

This cause is before the court on the defendant's motion for summary judgment (Doc. 12),

filed November 7, 2008.  Plaintiff filed an opposition to the motion (Doc. 17) on December 8, 2008,

to which defendant replied on December 19, 2008.  (Doc. 20).  Plaintiff Beasley has alleged claims

against his former employer, Nextran Corporation ("Nextran") for age discrimination and disability

discrimination.  The motion has been fully briefed and was orally argued to the court on April 15,

2009.[1]

Summary Judgment Standards

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

---

[1]      The parties consented to the exercise of dispositive jurisdiction by the undersigned
magistrate judge pursuant to 28 U.S.C. § 636(c) on February 8, 2008.  (Doc. 10).

show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, she may not merely rest on her pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

2

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The substantive law will identify which facts are material and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249.  His guide is the same standard necessary to direct a verdict:  "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983).  However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.  Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.  The non-movant need

not be given the benefit of every inference but only of every reasonable inference.  Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).


## Summary Judgment Facts

Applying these standards to the evidence in the record, the following facts appear to be undisputed or, if disputed, are taken here in the light most favorable to the non-moving plaintiff. Plaintiff was first employed by Mack Sales of Birmingham in 1972 to work as a truck parts salesman.  Beasley is 58 years of age, his birth September 28, 1950.  In June 2005, Mack Truck Center was acquired by defendant Nextran Corporation. (Plaintiff's Ex. 1, Beasley depo., pp. 11-12). Beasley was employed continuously at the same location from 1972 until his termination on September 27, 2006. When Nextan acquired the business the majority of the employees and managers remained the same.  Beasley reported directly to Keith Carter both before and after Nextran purchased the business. (Plaintiff's Ex. 1, Beasley depo., pp. 19, 71-72).  At the time of the acquisition by Nextran, Jimmy Sirmans became the new General Manager, and was moved from his position as Vice President of Finance and Insurance in Florida. (Plaintiff's Ex. 2, Sirmans depo., pp. 22-23, 26).  Sirmans was the highest level of manager on site at the facility where Beasley was employed.

Nextran operates as a sales center for truck parts and a truck service center.  (Plaintiff's Ex. 1, Beasley depo., pp. 21-22).  During Beasley's employment, there was a front parts counter and a back parts counter, although both are located in the same room, a few yards apart.  The front counter sells to the general public and customers of Nextran who are performing their own truck repairs.  The

4

back counter supplies parts to Nextran's technicians for truck repairs made in the onsite repair shop. (Plaintiff's Supplemental Ex. 2, Carter depo., p. 18).  The front counter generates more sales for Nextran. (Plaintiff's Supplemental Ex. 2, Carter depo., p. 20, and Plaintiff's Ex. 4, Nextran's EEOC Position Statement).  The back parts counter position does not generate new business and has limited sales potential. (Plaintiff's Supplemental Ex. 2, Carter depo., pp. 350-351, and Plaintiff's Ex. 4, Nextran's EEOC Position Statement).  Employees are assigned to work at either the front parts counter or at the back parts counter, although there are instances where employees may cover both. (Plaintiff's Supplemental Ex. 2, Carter depo, pp. 63-64).  New employees are usually assigned to work on the back counter because Nextran wants to make sure an employee is trained before he or she is assigned to work the front counter dealing with customers. (Plaintiff's Supplemental Ex. 2, Carter depo., pp. 79-80).

About six months before Beasley was terminated on September 27, 2006, he was moved from the back parts counter to work on the front parts counter.  At that time, the other front counter salesmen were Earl Reese (age 58) and Michael Cleveland (age 51).  Back parts counter employees were Phillip Dobbins (age 53), Timothy Kimbrell (age 48), and Danny Eddings (age 39).  Beasley never had a sales goal or quota when he worked on the back parts counter, although his sales of truck parts always were consistently lower than those of other parts salesmen. (Plaintiff's Supplemental Ex. 2, Carter depo., pp. 251-252).  Beasley was not given a sales goal or quota at the time he was moved to the front counter.  (Plaintiff's Supplemental Ex. 2, Carter depo., p. 218).  Front counter salesmen were given customer lists to enable them to telephone potential customers to try to generate sales.  Back counter salesmen were not given a customer list as they concentrated on sales to the in-

house mechanics.  After Beasley was moved to the front counter he still was required to work on the back counter from 7:00 a.m. to 10:00 a.m. each day, until the second-shift back parts counter salesmen arrived.  (Plaintiff's Ex. 1, Beasley depo., p. 40; Plaintiff's Supplemental Ex. 2, Carter depo., pp. 270-272).  Beasley and other experienced counter salesmen also were  required to help train the new employees on the back counter on how to find parts, locate parts on the computer, and help the mechanics.  (Plaintiff's Ex. 1, Beasley depo., pp. 40-41, 45).  Although training new hires took time away from an employee's ability to sell parts,  (Plaintiff's Supplemental Ex. 2, Carter depo., pp. 106-107), it usually required only about 30 minutes each day.  (Plaintiff's Ex. 1, Beasley depo., pp. 101-102).  Beasley also was required to make parts deliveries to customers, which subtracted from his time working the front parts counter.

During 2005 and up to the point of his termination in 2006, plaintiff's sales were consistently and substantially lower than those of the other front counter salesmen, Reese and Cleveland.  During 2005, plaintiff's total sales were $950,064.96, while Reese's were $1,333,012.42 and Cleveland's were $1,745,863.96.  During 2006, up to the end of September, plaintiff's sales were $513,104.77, while, for the same time period, Reese's were $1,086,500.86 and Cleveland's were $1,601,773.42. (Defendant's Exs. 3 & 4).

Although Beasley's sales performance had never been an issue before Nextran acquired the business, Carter began to speak to Beasley about improving his sales performance in the spring of 2006.  In early spring 2006, Beasley was moved to the front parts counter where there was a greater potential to increase sales, although he continued to have duties on the back parts counter for several hours each day.  Prior to May 2006, Carter went to lunch with Beasley on one or two occasions and

6

discussed with him the need to improve his sales figures.  (Defendant's Ex. 1, Beasley depo., pp. 78-79).  Although plaintiff admits that Carter discussed with him the need to improve his sales performance, no documentation of employment counseling was put in plaintiff's personnel file.  In May 2006, Carter held a formal meeting with Beasley to discuss his low sales figures and to tell plaintiff he had to improve them.  At the meeting, Carter told Beasley that he had to get his sales up "because we got new young guns" working for Nextran.  (Plaintiff's Ex. 1, Beasley depo., p. 76).  Once again, Carter did not document this meeting or the counseling of plaintiff about his sales performance.

Despite concerns about Beasley's sales fugures, he received a bonus in the June 2006 under Nextran's Parts Sales Incentive Plan.  Carter specifically took into account Beasley's sales performance in awarding him a bonus, and testified that bonuses are not awarded unless the employee is doing a good job.

On July 28, 2006, Beasley was called into a meeting with Sirmans and Carter and questioned about his sales.  (Plaintiff's Ex. 1, Beasley depo., p. 86).  Although a "Notice of Discussion" for "lack of performance" was issued to Beasley during the meeting, Beasley was never asked to sign the reprimand and was not given a copy. (Plaintiff's Ex. 1, Beasley depo., p. 86; Plaintiff's Supplemental Ex. 2, Carter depo., pp. 207-208, and Plaintiff's Ex. 7, July 28, 2006 Notice of Discussion).  Sirmans testified that Beasley's sales was not the most important factor and that he wanted Beasley to "move faster" when he pulled parts.  (Plaintiff's Ex. 2, Sirmans depo., p. 123).  Nevertheless, Sirmans told Beasley that he had to get his sales up 15% over the next sixty days. (Plaintiff's Ex. 2, Sirmans depo., pp. 109-110).  He pointed out that, as one of about four front parts

counter salesmen, Beasley's share of sales should be closer to 25%, but were then only 12%. (Plaintiff's Ex. 6, Sirmans July 28, 2006 E-mail). Sirmans told Beasley that, due to his long tenure of service, he would be given 60 days to increase his sales to 15%, at which time a higher goal would be set. Also, Sirmans told Beasley to "take a few days off and see what jobs might be available around town." (Plaintiff's Ex. 1, Beasley depo., p. 96; Plaintiff's Ex. 2, Sirmans depo., pp. 111-112; Plaintiff's Supplemental Ex. 2, Carter depo., p. 244, and Plaintiff's Ex. 6, Sirmans July 28, 2006 E-mail). At the conclusion of the meeting, Beasley understood that his job was in jeopardy if he did not increase his sales to at least 15% of the total parts sales. He was not offered any additional training or assistance to meet the goal.

The next month, in August 2006, plaintiff received a 2% pay increase. Beasley was the second most knowledgeable employee behind Earl Reese. (Plaintiff's Supplemental Ex. 2, Carter depo., pp. 208-209). Sirmans told Beasley that he (Beasley) had forgotten more than most would know. (Plaintiff's Ex. 2, Sirmans depo., p. 122). No one talked to Beasley about his pay increase. (Plaintiff's Ex. 1, Beasley depo., p. 166 and Plaintiff's Exb. 3, Sirmans depo., p. 168). Sirmans and Carter approved Beasley's 2% pay raise. (Plaintiff's Supplemental Exb. 2, Carter depo., p. 286-287).

Carter conducted an employee evaluation in August 2006, and wrote that Beasley was "Great at helping the younger countermen" and "very knowledgeable" (Plaintiff's Ex.7, Carter's August 2006 Evaluation Notes). Beasley received another bonus in August, approved by Carter.

During the months of July and August 2006, Beasley's sales generated the highest *percentage* of gross profits, although they were lowest gross profits among front counter salesmen.[2]  His sales in July 2006 generated gross profits of $18,444.27, for a *rate* of profit of 28.44%.  By comparison, Earl Reese had gross profits for that month of $38,081.93 (23.77% profit), Michael Cleveland had $30,367.20 (26.03% profit), and Phillip Dobbins had $23,167.37 (27.90% profit).  Similarly, in August 2006, Beasley's sales produced a gross profit of $13,348.85, which was a profit rate of 28.61%, compared to Reese's sales producing $36,136.92 (26.74% profit), Cleveland's sales producing $44,282.33 (26.41% profit), and Dobbins' producing $39,871.78 (24.33% profit). Beasley was continuously aware of his sales as he was able to access daily and monthly sales reports, which he checked almost daily.

At some point during the 60-day period, Beasley approached Carter about being moved back to the back parts counter, and Carter agreed to look into it.  Carter discussed it with Earl Reese, the assistant parts manager, and they could not understand why Beasley wanted to return to the back parts counter where there was less opportunity to his increase sales.  (Plaintiff's Supplemental Ex. 2, Carter depo. pp. 259-261).  Beasley was not returned to the back parts counter.

On September 27, 2006, Sirmans and Carter terminated Beasley.  (Plaintiff's Ex. 1, Beasley depo., pp. 103-104, and Plaintiff's Ex. 10, September 27, 2006 Notice of Discussion).  Sirmans completed a Notice of Discussion form documenting Beasley's termination, which was not signed

---

[2]     As used here, "gross profits" reflects the dollar amount of profit realized from the employee's sales for the month.  The "rate of gross profit" reflects the gross profit as a percentage of gross sales.  For example, in July 2006, Beasley's sales resulted in a realized "gross profit" of $18,444.27, which constituted 28.44% of the gross sales for the month.

by Beasley. (Plaintiff's Ex. 10, September 27, 2006 Notice of Discussion).  At the time, Beasley's sales constituted 14.8% of all parts sales.  Sirmans told Beasley that he had increased his sales but it was not enough. (Plaintiff's Ex. 1, Beasley depo., p. 104).  In addition to the Notice of Discussion form, Sirmans also filled out a "Reason for Separation" form regarding Beasley's termination and indicated on the form "Employee had no rebuttal." (Plaintiff's Ex. 11, September 27, 2006 Reason for Separation form).  The form is supposed to be filled out by the exiting employee, however Beasley was never given the form to fill out. (Plaintiff's Supplemental Ex. 2, Carter depo., pp. 384-86).  Plaintiff was terminated the day before his 56th birthday.

Beasley has suffered from "a mild case" of Multiple Sclerosis for more than 20 years, and Carter was aware Beasley had been diagnosed with MS, having talked with Beasley about MS and the symptoms. (Plaintiff's Supplemental Ex. 2, Carter depo., pp. 173-74).  Carter was aware Beasley was required to take a day off "here or there" for a doctor's visit related to his MS.  (Plaintiff's Supplemental Ex. 3, Carter depo.  p. 174).  Plaintiff's MS does not require medical treatment, and it has not interfered with his ability to work or carry on other activities.  Beasley does not consider himself disabled, and does not believe that defendant treated him any differently because of his MS. (Plaintiff's Ex. 1, Beasley depo., pp. 111-15).  Although Carter knew of plaintiff's MS, Sirmans did not.

## Discussion

Plaintiff alleges that his termination by Nextran was discriminatory based on his age and his disability.  Nextran's motion for summary judgment seeks summary dismissal of both claims,

contending that plaintiff has not established a *prima facie* case of either age or handicap discrimination, and because he has failed to show that Nextran's articulated reason for his termination — his poor sales performance — was a mere pretext for discrimination.  Each theory is discussed below.


*I.  Age Discrimination*

Most of the factual development and legal briefing between the parties focuses on plaintiff's age discrimination claim.  Since the briefing in this case by counsel, the Supreme Court announced a new decision concerning the analysis of age discrimination cases.  In Gross v. FBL Financial Services, Inc., ___ U.S. ___, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (June 18, 2009), the Court addressed whether a "mixed motive" jury instruction in an age discrimination case was proper.  In doing so, the Court concluded that the "mixed motive" theory was not available in age discrimination cases under the Age Discrimination in Employment Act, 29 U.S.C. § 623(a), because the standard of proof in such a case requires the plaintiff to show that age was not simply "a motivating factor" in the adverse employment decision, but was the "but for" factor.

> [T]he burden of persuasion necessary to establish employer liability is the same in alleged mixed-motives cases as in any other ADEA disparate-treatment action.  A plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the "but-for" cause of the challenged employer decision.

Gross v. FBL Financial Services, Inc., ___ U.S. ___, ___, 129 S. Ct. 2343, 2351, 174 L. Ed. 2d 119 (June 18, 2009)(citing Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 141-43, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)).  The Court then stated its holding: "We hold that a plaintiff

bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." Id. at ___, 120 S. Ct. at 2352.

Plaintiff acknowledges in this case that he must rely on circumstantial evidence to establish his claim of age discrimination.  In Reeves the Supreme Court described the method a plaintiff may use to prove an age discrimination claim using circumstantial evidence, assuming[3] that the McDonnell Douglas test in Title VII cases applies also to ADEA claims.  The Court said:

> McDonnell Douglas and subsequent decisions have "established an allocation of the burden of production and an order for the presentation of proof in... discriminatory-treatment cases." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).  First, the plaintiff must establish a *prima facie* case of discrimination.  Ibid.; Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).  It is undisputed that petitioner satisfied this burden here: (i) at the time he was fired, he was a member of the class protected by the ADEA ("individuals who are at least 40 years of age," 29 U.S.C. § 631(a)), (ii) he was otherwise qualified for the position..., (iii) he was discharged by respondent, and (iv) respondent successively hired three persons in their thirties to fill petitioner's position.....  The burden therefore shifted to respondent to "produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." Burdine, *supra*, at 254, 101 S. Ct. 1089.  This burden is one of production, not persuasion; it "can involve no credibility assessment." St. Mary's Honor Center, *supra*, at 509, 113 S. Ct. 2742.  Respondent met this burden by offering admissible evidence sufficient for the trier of fact to conclude that petitioner was fired because of his failure to maintain accurate attendance records.....  Accordingly, "the McDonnell Douglas framework

---

[3]   The Court noted that "This Court has not squarely addressed whether the McDonnell Douglas framework, developed to assess claims brought under § 703(a)(1) of Title VII of the Civil Rights Act of 1964, 78 Stat. 255, 42 U.S.C. § 2000e-2(a)(1), also applies to ADEA actions.  Because the parties do not dispute the issue, we shall assume, *arguendo*, that the McDonnell Douglas framework is fully applicable here." Reeves v Sanderson Plumbing Products, Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 2105, 147 L. Ed. 2d 105 (2000).

— with its presumptions and burdens" — disappeared, <u>St. Mary's Honor Center</u>, *supra*, at 510, 113 S. Ct. 2742, and the sole remaining issue was "discrimination *vel non*," <u>Aikens</u>, *supra*, at 714, 103 S. Ct. 1478.

Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." <u>Burdine</u>, 450 U.S., at 253, 101 S. Ct. 1089. And in attempting to satisfy this burden, the plaintiff — once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision — must be afforded the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." <u>Ibid</u>.; <u>see also</u> <u>St. Mary's Honor Center</u>, *supra*, at 507-508, 113 S.Ct. 2742. That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination "by showing that the employer's proffered explanation is unworthy of credence." <u>Burdine</u>, *supra*, at 256, 101 S. Ct. 1089. Moreover, although the presumption of discrimination "drops out of the picture" once the defendant meets its burden of production, <u>St. Mary's Honor Center</u>, *supra*, at 511, 113 S. Ct. 2742, the trier of fact may still consider the evidence establishing the plaintiff's *prima facie* case "and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual," <u>Burdine</u>, *supra*, at 255, n. 10, 101 S. Ct. 1089.

<u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 142-143, 120 S. Ct. 2097, 2106,147 L. Ed. 2d 105 (2000). <u>Gross</u> emphasized that part of <u>Reeves</u> which held that "[w]hen a plaintiff alleges disparate treatment, liability depends on whether the protected trait (under the ADEA, age,) actually motivated the employer's decision. That is, *the plaintiff's age must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome*." <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 141, 120 S. Ct. 2097, 2105, 147 L. Ed. 2d 105 (2000)(emphasis added); <u>see also</u> <u>Summers v. Winter</u>, 303 Fed. Appx. 716, 718 (11th Cir. 2008); <u>Tolbert v. Jefferson County Commission</u>, 318 Fed. Appx. 747, 748 (11th Cir. 2008).

In attempting to show that an articulated reason is not the real reason for the employment action, but a mere pretext for discrimination, the plaintiff

> "must meet [the proffered legitimate] reason head on and rebut it, and the employee cannot succeed simply by quarreling with the wisdom of that reason." Chapman, 229 F.3d at 1030.  "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." Id. at 1024-25.

Dowlen v. Secretary Of Veterans Affairs, 288 Fed. Appx. 572, 579 (11th Cir. 2008)(quoting Chapman v. AI Transport, 229 F.3d 1012, 1024-1025 (11th Cir. 2000)).  The employee cannot show pretext merely by quarreling with the wisdom or fairness of the employer's decision, see Brown v. Northside Hospital, 311 Fed. Appx. 217, 223 (11th Cir. 2009); Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000), he must demonstrate that the articulated reason was not the true reason for the employment action.  An employer may dismiss an employee for a good reason, a bad reason, or for no reason, as long as it is not a prohibited discriminatory reason.

Defendant Nextran makes the argument that plaintiff cannot establish a *prima facie* showing of age discrimination because he was not qualified for the job of front parts counter salesman. Nextran concedes that plaintiff was in the protected age class, in that he was 55 years old at the time of the dismissal, and that he suffered an adverse employment action, being terminated from employment.  Nextran appears not to contest that plaintiff's position was subsequently filled by a younger employee.  Thus, the only element of the *prima facie* test challenged by Nextran is whether plaintiff was qualified for the position.

14

Nextran contends that plaintiff could not meet its legitimate expectations with respect to sales and, therefore, was not qualified.  The court can dispense with this assertion quickly by noting that plaintiff was employed as a parts salesman with Nextran's predecessors for over 30 years.  Carter and Sirmans both acknowledged that plaintiff was "very knowledgeable" about truck parts and had "forgotten more [about parts] than most will ever know."  These facts more than adequately prove that plaintiff was qualified to be a truck parts salesman.  Therefore, the court finds that plaintiff has established a *prima facie* case of age discrimination, shifting the burden of articulating a reason for the dismissal to defendant.

Nextran has clearly articulated its reason for terminating plaintiff's employment: his sales were too low compared to other salesmen, and he failed to increase them adequately after being given a chance to do so.  This is plainly a legitimate business consideration.  Nextran is in the business of selling truck parts and repairing trucks.  Inadequate sales jeopardizes its ability to stay in business.  It is not unusual for many types of sales businesses to impose minimum sales quotas on their salesmen to assure an adequate level of business activity.  Thus, the reason articulated by Nextran is one that a business might use legitimately to terminate an employee.

The burden to disprove this articulated reason was not the real reason shifts to the plaintiff, who always bears the burden of proving intentional, purposeful discrimination.  The court believes that he has not shown that there are genuine issues of material fact concerning this reason.  Plaintiff admits that his supervisors at Nextran began telling him in the spring of 2006 that his sales figures

were too low and that he needed to work to increase them.[4]  Plaintiff does not dispute that the other

front parts counter salesmen had substantially higher sales.  The other three salesman who worked

mainly on the front counter, Reese, Cleveland, and Dobbins,[5] averaged above $100,000 per month

in sales, while plaintiff averaged below $40,000 per month.  In the July 2006 meeting, Sirmans

pointed out to plaintiff that, with four front counter salesmen, he should average about 25% of the

sales on the front counter, but, in fact, he averaged only 12% of the total sales.  Sirmans told plaintiff

that he would be given 60 days to raise his sales merely to 15% of the total front counter sales, at the

end of which time a new goal would be set.  Plaintiff clearly understood that he would lose his job

if he did not increase his sales to 15% by the end of the 60 days.  He failed to do so.

Beasley quarrels with the wisdom or fairness of the 15% target, contending that he was still

required to work the back counter from 7:00 a.m. to 10:00 a.m. every morning, that he was required

to train new hires, and that he was required to deliver parts to customers, all of which took him away

from sales on the front counter.  Fair or not (and court does not believe it was unfair), this evidence

does not create a genuine issue of fact as to whether the plaintiff's failure to reach the 15% sales

target was the real reason for his termination.  Plaintiff admits that other front counter salesmen also

---

[4]     In one of these conversations, Carter is reported to have told plaintiff that he needed to increase his sales because Nextran had a bunch of "young guns."  While plaintiff concedes this is not direct evidence of discrimination, he argues it has probative value in showing a discriminatory motive.  The decisionmaker in this case, however, was the general manager, Sirmans, not Carter. While Carter participated in the meetings, plaintiff acknowledges that Sirmans is the person who set his 15% sales goal in the July meeting and who made the decision to terminate his employment in September 2006.

[5]     Dobbins also worked on the back parts counter, but spent a large amount of time working the front counter.  Unlike plaintiff, Dobbins did not have customer call list from which he could make calls to customers seeking sales.

were involved in training new hires, and that this usually took only about 30 minutes each day.  He admits that Reese, as the assistant parts manager, had substantial administrative duties in addition to sales, yet was able to about double plaintiff's sales numbers.  Whether the 15% target was wise or realistic, there is no evidence disputing that plaintiff's inability to generate adequate sales volume was the true reason for his termination.  Because the plaintiff cannot show that the articulated reason for his dismissal — his low sales figures — was a pretext for discrimination, Nextran's motion for summary judgment with respect to the age discrimination claim is due to be granted.

### II.  Disability Discrimination

The court will not spend much time discussing this claim, as even plaintiff acknowledges that it is not his strongest claim.  To state a claim for relief under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, the plaintiff must "show that he: (1) had a disability; (2) was otherwise qualified to perform the job; and (3) was discriminated against based on his disability." Collado v. United Parcel Service, Co., 419 F.3d 1143, 1149 (11th Cir. 2005) (citing Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1192 (11th Cir. 2004)).  The ADA defines a disability as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." Id. at 1154.

Under the undisputed evidence here, plaintiff is unable to make out a *prima facie* case of disability discrimination because he can meet neither the first nor third element of the claim.  First, although it is true that plaintiff has "mild" MS, he admits that it has not limited his major life

activities.  It does not require medical treatment, it does not interfere with his work, and he has offered no evidence that it otherwise limits his mobility, self-care, or eating.  Beasley simply cannot meet the definition of having a "disability" within the meaning of the statute.  Second, he admits that Nextran has not treated him any differently due to his MS.  Although Carter was aware of it, Sirmans was not, and there is no evidence that plaintiff was subjected to any employment restrictions due to his MS.  Thus, because plaintiff cannot prove a *prima facie* case of disability discrimination, Nextran's motion for summary judgment on this claim is due to be granted.

<u>Conclusion</u>

The court finds that there are no genuine issues of material fact and that the defendant is entitled to judgment as a matter of law.  By separate order, the court will grant Nextran's motion for summary judgment and dismiss this action with prejudice.

DONE this 28th day of September, 2009.

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE